**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BIZTANK, INC., IMMEDIATE MARKETING & BUSINESS CONSULTING, INC. a/k/a IMBC, and JOEL KEIN, individually, and as an Officer and Shareholder of IMMEDIATE MARKETING & BUSINESS CONSULTING, INC. and BIZTANK, INC., <br><br>        Plaintiff, <br><br><br><br>v. <br><br><br><br>MEHULOL PUBLICATIONS, LLC d/b/a AMI MAGAZINE, YITZCHOK FRANKFURTER, And RICHY FRANKFURTER <br><br>        Defendants. | ECF Case <br> Civil Case No. 1:17-cv-6869 |

| |
|---|
| MEHULOL PUBLICATIONS, LLC d/b/a AMI MAGAZINE, YITZCHOK FRANKFURTER, And RECHY FRANKFURTER <br><br>        Counterclaim-Plaintiffs, <br><br>v. <br> LEAH KLEIN, Individually and as officer and shareholder of IMMEDIATE MARKETING & BUSINESS CONSULTING, INC. and BIZTANK, INC., <br><br>        Counterclaim-Defendants |

**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS OF DEFENDANTS
MEHULOL PUBLICATIONS, LLC D/B/A AMI MAGAZINE, YITZCHOK
FRANKFURTER AND RECHY FRANKFURTER**

Defendants, MEHULOL PUBLICATIONS, LLC d/b/a AMI MAGAZINE, Yitzchok Frankfurter, and Rechy Frankfurter, submit this Answer and affirmative defenses to Plaintiffs' Complaint, and asserts counterclaims against Plaintiffs and Counterclaim Defendant Leah Klein ("Ms. Klein"), as follows:

## THE PARTIES

1.      Admit the allegations contained in paragraphs "1", "2" and "3".

2.      Admit the allegations contained in paragraphs "4", "5" and "6."

3.      Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs "7", "8" and "9" and therefore deny them.

4.      Admit the allegations contained in paragraphs "10" and "11."

## STATEMENT OF FACTS
## FACTS COMMON TO ALL CAUSES OF ACTION

5.      Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs "12", "13", "14", "15" and "16".

6.      Deny the allegations contained in paragraphs "17."

7.      Admit the allegations contained in paragraphs "18."

8.      Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs "19", "20", "21."

9.      Admit the allegations contained in paragraph "22."

10.     Deny the allegations contained in paragraphs "23" except admit that Klein began writing for AMI business on February 2015.

11.     Deny the allegations contained in paragraph "24" except admit that Klein initially started to write for AMI as an unpaid contributor and that at some point and as a mere

2

convenience for AMI,  the emails that AMI received through its parnoosa@amimagazine.org were forwarded to Leah Klein.

12.     Deny the allegations contained in paragraph "25."

13.     Admit the allegations contained in paragraphs "26."

14.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs "27", "28", "29", "30", "31" and consequently deny them.

15.     Deny the allegations contained in paragraph "32."

16.     Admit the allegations contained in paragraph "33" except deny that this was Klein's "business platform process" as the same exact platform was already widely recognized on national television on the NBC show "Shark Tank" and Maurice Stein had pioneer a similar platform for AMI in early 2013 and 2014.

17.     Deny the allegations contained in paragraph "34."

18.     Deny the allegations contained in paragraphs "35" and "36."

19.     Partially admit the allegations contained in paragraph "37" particularly that the website biztankmoguls.com was created prior to AMI's publication of the first AMI's Biztank article and deny the rest of the allegations contained in paragraph "37."

20.     Deny the allegations contained in paragraphs "38."

21.     Admit the allegations contained in paragraphs "39."

22.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs "40", "41", and therefore deny them.

23.     Admit the allegations contained in paragraph "42" except deny that the references to AMI were merely to denote the media outlet and that Klein and IMBC personally paid for all expenses.

24.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs "43", "44", and therefore deny them.

25.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "45", and therefore deny them.

26.     Deny the allegations contained in paragraph "46."

27.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "47."

28.     Deny the allegations contained in paragraph "48" except admit that the Daily News published an article on April 4, 2017 discussing BizTank and referring to it as the "Brooklyn version of Shark Tank."

29.     Deny the allegations contained in paragraph "49."

30.     Admit the allegations contained in paragraph "50" except lack knowledge or information as to when exactly plaintiffs retained trademark counsel.

31.     Admit the allegations contained in paragraph "51" except deny that Joel Klein is the creator of BizTank.

32.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "52" and therefore deny them.

33.     Admit the allegations contained in paragraphs "53" except deny that Joel Klein is the creator and producer of BizTank.

34.     Deny the allegations contained in paragraphs "54", "55" and "56."

35.     Deny the allegations contained in paragraph "57" except admit that defendants received a cease and desist letter on June 2, 2017.

36.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "58" and therefore deny them.

37.     Admit the allegations contained in paragraphs "59."

38.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "60" and therefore deny them.

39.     Admit the allegations contained in paragraphs "61."

40.     Deny the allegations contained in paragraphs "62" except admit that defendants contacted the videographer.

41.     Deny the allegations contained "63", "64", "65", "66", "67", "68" and "69."

42.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "70" and therefore deny them.

43.     Deny the allegations contained in paragraph "71" except admit defendants obtained an ex parte injunction from Rabbinical Court.

44.     Deny the allegations contained in paragraph "72" except admit sending a written notice to Mishpacha to put them on notice regarding AMI's rights in connection to the BizTank mark.

45.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "73" and therefore deny them.

46.     Deny the allegations contained in paragraph "74" except admit that defendants own two trademark applications serial Nos. 87496184 and 87496064 before the United States Patent and Trademark Office and four New York Trademark Registration Certificates Nos. R33063, S24091, S24092 and S24093.

47.     Deny the allegations contained in paragraphs "75", "76" "77", "78."

48.     Deny the allegations contained in "79" and admit that defendants received a letter from plaintiffs' counsel on or about July 14, 2017.

49.     Deny the allegations contained in paragraph "80" except admit proposing settlement as an option to resolve the dispute.

50.     Deny the allegations contained in paragraph "81" except admit no settlement discussions occurred.

51.     Deny the allegations contained in paragraph "82" except admit that there has been media coverage for BizTank.

52.     Deny the allegations contained in paragraphs "83", "84", "85", "86", "87", "88", "89" and "90".

53.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "91".

54.     Deny the allegations contained in paragraphs "92."

55.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "93".

56.     Admit the allegations contained in paragraphs "94."

57.     Deny the allegations contained in paragraph "95."

58.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "96" and "97".

## AS AND FOR A FIRST CAUSE OF ACTION FOR MISAPPROPRIATION OF SKILLS, LABOR, AND EXPENDITURES

59.     Paragraph "98" purports to reiterate plaintiffs' allegations and does not require response.

60.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs "99" and "100" and therefore, deny them.

61.     Deny the allegations contained in paragraphs "101" and "102."

62.      Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs "103" and therefore, deny them.

63.     Deny the allegations contained in paragraphs "104","105", "106", "107", "108", "109", "110", "111", "112", "113", "114", "115", "116" and "117."

64.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "118" and therefore, deny them.

**AS AND FOR A THIRD CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS**

65.     Paragraph "119" purports to reiterate plaintiffs' allegations and does not require response.

66.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "120", "121" and "122" and therefore, deny them.

67.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "123" and therefore deny them.

68.     Deny the allegations contained in paragraphs "124", "125", "126", "127",

69.     Deny the allegations contained in paragraph "128" except admit obtaining an ex parte injunction from Rabbinical Court.

70.     Deny the allegations contained in paragraphs, "129," "130" and "131."

**AS AND FOR A THIRD CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS**

71.     Paragraph "132" purports to reiterate plaintiffs' allegations and does not require response.

72.     Deny the allegations contained in paragraphs "133", "134",

73.      Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "135" and therefore, deny them.

74.     Deny the allegations contained in paragraph "136" except admit obtaining an ex parte injunction from Rabbinical Court.

75.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "137" and therefore, deny them.

76.     Deny the allegations contained in paragraphs "138", "139" and "140."

77.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs "141" and therefore, deny them.

78.     Deny the allegations contained in paragraph "142" and "143."

## AS AND FOR A FORTH CAUSE OF ACTION FOR INTERFERENCE WITH PROSPECTIVE COMMERCIAL ADVANTAGE AND UNFAIR COMPETITION

79.     Paragraph "144" purports to reiterate plaintiffs' allegations and does not require response.

80.     Deny the allegations contained in paragraph "144", "145", "146" and "147."

## AS AND FOR FIFTH CAUSE OF ACTION FOR LIBEL AS AGAINST DEFENDANTS YITZCHOK FRANKFURTER AND RECHY FRANKFURTER

81.     Paragraph "148" purports to reiterate plaintiffs' allegations and does not require a response.

82.     Deny the allegations contained in paragraph "149" except admit defendant Mr. Frankfurter sent emails on June 8, 2017, June 11, 2017 and June 12, 2017.

83.     Admit the allegations contained in paragraphs "150."

84.     Deny the allegations contained in paragraph "151."

85.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "152" and "153" and therefore, deny them.

86.     Deny the allegations contained in paragraph "154."

**AS AND FOR A SIXTH CAUSE OF ACTION FOR SLANDER AS AGAINST DEFENDANTS YITZCHOK FRANKFURTER AND RECHY FRANKFURTER**

87.     Paragraph "155" purports to reiterate plaintiffs' allegations and does not require a response.

88.     Deny the allegations contained in paragraphs "156", "157", "158", "159", "160", "161" and "162."

**AS AND FOR A SEVENTH CAUSE OF ACTION AS AGAINST DEFENDANTS YITZCHOK FRANKFURTER AND RECHY FRANKFURTER FOR INJURIOUS FALSEHOOD**

89.     Paragraph "163" purports to reiterate plaintiffs' allegations and does not require a response.

90.     Deny the allegations contained in paragraphs "164", "165", "166" and "167."

**AS AND FOR AN EIGHTH CAUSE OF ACTION FOR A PRIMA FACIE TORT**

91.     Paragraph "168" purports to reiterate plaintiffs' allegations and does not require a response.

92.     Deny the allegations contained in paragraph "169," "170", "171" and "172."

**AS AND FOR A NINTH CAUSE OF ACTION TRADE DRESS INFRINGEMENT AND FALSE DESIGNATION OF ORIGIN 15 U.S.C. § 1125(A)**

93.     Paragraph "173" purports to reiterate plaintiffs' allegations and does not require a response.

94.     Admit the allegations contained in paragraphs "174"

95.     Deny the allegations contained in paragraph "175" except admit that the

trademark application was amended after it was filed.

96.     Admit the allegations contained in paragraph, "176."

97.     Deny the allegations contained in paragraph "177" except admit that defendants

filed a trademark application before the Patent and Trademark Office.

98.     Admit the allegations contained in paragraph "178."

99.     Deny the allegations contained in paragraphs "179."

100.    Lack knowledge or information sufficient to form a belief concerning the

allegations contained in paragraph "180" and therefore deny it.

101.    Deny the allegations contained in paragraphs "181", "182."

102.    Paragraph "183" is a recitation of a statute and therefore, does not require a

response.

103.    Deny the allegations contained in paragraphs "184", "185", "186", "187" and

"188."

## AS AND FOR THE TENTH CAUSE OF ACTION TRADEMARK DILUTION IN VIOLATION OF NEW YORK GENERAL BUSINESS LAW (N.Y.GEN. BUS. LAW § 360-1)

104.    Paragraph "189" purports to reiterate plaintiffs' allegations and does not require a

response.

105.    Paragraph "190" is a recitation of a statute and therefore, does not require a

response.

106.    Admit the allegations contained in paragraph "191" except deny that the BizTank

name and mark belongs to Klein or any of the plaintiffs in this action.

107.    Deny the allegations contained in paragraphs "192", "193", "194", "195", 196" and "197."

## AS AND FOR AN ELEVENTH CAUSE OF ACTION DECEPTIVE ACTS AND PRACTICES UNLAWFUL IN VIOLATION OF NEW YORK GENERAL BUSINESS LAW (N.Y. GEN. BUS. LAW §§ 349 AND 350)

108.    Paragraph "198" purports to reiterate plaintiffs' allegations and does not require response.

109.    Admit the allegations contained in paragraphs "199"

110.    Paragraph "200" is a recitation of a statute and therefore, does not require a response.

111.    Deny the allegations contained in paragraphs "201", "202", "203", "204", "205" and "206."

## AS AND FOR A TWELFTH CAUSE OF ACTION TRADEMARK INFRINGEMENT IN VIOLATION OF NEW YORK STATE COMMON LAW

112.    Paragraph "207" purports to reiterate plaintiffs' allegations and does not require a response.

113.    Deny the allegations contained in paragraphs "208", "209", "210", "211",

114.    Deny the allegations contained in paragraph "212" except setting up a booth at the LTB tradeshow.

115.    Lack knowledge or information sufficient to form a belief concerning the allegations contained in paragraph "213."

116.    Deny the allegations contained in paragraphs "214", "215", "216" and "217."

**AS AND FOR A THIRTEENTH CAUSE OF ACTION UNFAIR COMPETITION
IN VIOLATION OF NEW YORK STATE COMMON LAW**

117.    Paragraph "218" purports to reiterate plaintiffs' allegations and does not require a response.

118.    Deny the allegations contained in paragraphs "219", "220" and "221."

**AS AND FOR A FOURTEENTH CAUSE OF ACTION ENJOIN THE USE OF
PLAINTIFF BIZTANK'S CORPORATE NAME**

119.    Paragraph "222" purports to reiterate plaintiffs' allegations and does not require a response.

120.    Denies the allegations contained in paragraph "223" except admit that the company was incorporated on July 12, 2016.

121.    Lack knowledge or information sufficient to form a belief concerning the allegations contained in paragraphs "224" and "225."

122.    Deny the allegations contained in paragraphs "226", "227", "228" and "229."

123.    Deny the allegations contained in paragraph "230" and therefore deny that plaintiffs are entitled to any relief on any of their causes of action.

**AFFIRMATIVE DEFENSES**

124.    Defendants assert the following affirmative defenses. To the extent any of the defenses, in whole or in part, serve merely to negate an element of plaintiffs' claims, defendants in no way seek to relieve plaintiffs of their burden of proof of persuasion on each element of their claims.

**First Affirmative Defense**

125.     The Complaint fails to state to a cause of action upon which relief may be granted. The Complaint does not adequately allege the elements of some or all of the purported causes of action. Specifically, but without limiting the foregoing, the Complaint fails to allege the required factual allegations to set forth a prima facie case of deceptive acts and practices unlawful in violation of New York general business law (N.Y. Gen. Bus. Law §§ 349 and 350).

**Second Affirmative Defense**

126.     Defendants created and own the mark "BizTank."  Therefore, Plaintiffs are not entitled to maintain their claims or to assert, among others, infringement of a trademark, because the mark "BizTank" belongs to defendants.

**Third Affirmative Defense**
**(Unclean Hands)**

127.     Plaintiffs' claims are barred due to Plaintiffs' unclean hands.  Specifically, plaintiffs have violated their duty of good faith and fair dealing and have instituted this lawsuit based on misrepresentations, including without limitation, the fact that plaintiffs misappropriated defendants' trademark to create a competing business.

**Fourth Affirmative Defense**
**(Waiver, Release, Consent and Estoppel)**

128.     Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver, release, consent and estoppel.

**Fifth Affirmative Defense**
**(Laches)**

129.     Plaintiffs' claims are barred by the equitable doctrine of laches.

### Sixth Affirmative Defense
### (Failure to Mitigate Damages)

130.     Plaintiffs have failed and refused to mitigate its damages, and any award of

damages, if any, must therefore be diminished.

### Seven Affirmative Defense

131.     Plaintiffs fail to name essential parties to this action, to wit, Joel Klein's wife and

business partner, Leah Klein.

### Eight Affirmative Defense

132.     Plaintiffs' claims are barred because plaintiffs' purported losses or expenditures

incurred were solely the result of Plaintiffs' own culpable conduct.

### Ninth Affirmative Defense
### (Preemption of New York's Consumer Protection from Deceptive Acts and Practices Act)

133.     The New York Consumer Protection from Deceptive Acts and Practices Act, New

York Code: Article 22A. §349, et. seq., is preempted by relevant patent, trademark or copyright

law.


### COUNTERCLAIMS


### The Parties

134.     Counterclaim-plaintiff MEHULOL PUBLICATIONS, LLC d/b/a AMI

MAGAZINE is a domestic limited company, duly organized under the laws of the State of New

York with a principal place of business at 1575 50th street, Brooklyn, New York 11219.

135.     Counterclaim-plaintiff Yitzchok Frankfurter ("Mr. Frankfurter") is, and at all

relevant times was a resident of the County of Kings, State of New York.

136.     Counterclaim-plaintiff Rechy Frankfurter ("Mrs. Frankfurter") is, and at all

relevant times was a resident of the County of Kings, State of New York.

137.    Mr. and Mrs. Frankfurter are the founders of AMI Magazine ("AMI").

138.    Upon information and belief, Counterclaim-defendant Joel Klein ("Klein") is, and at all relevant times was a resident of the County of Kings, State of New York.

139.    Upon information and belief, Counterclaim defendant Leah Klein ("Ms. Klein") is, and at all relevant times was a resident of the County of Kings, State of New York.

140.    Upon information and belief, Counterclaim-defendant Immediate Marketing & Business Consulting, Inc, a/k/a IMBC ("IMBC") is, and at all relevant times was a domestic corporation duly organized under the laws of the State of New York with a principle place of business located at 219 Havemeyer Street, Brooklyn, New York 11211.

141.    Upon information and belief, counterclaim-defendant Biztank Inc. is, and at all relevant times was a domestic corporation organized under the laws of the State of New York with a principle place of business located at 219 Havemeyer Street, Brooklyn, New York 11211.

142.    Upon information and belief Klein is the CEO and founder of IMBC and he also incorporated BizTank, Inc.

143.    Leah Klein is the spouse of Joel Klein and, upon information and belief, an officer of IMBC, co-founder of BizTank, Inc., as well as Klein's partner in both entities.  Certificate of Incorporation, **Docket 3-2-A p. 2**.

144.    Counterclaim-plaintiffs hereby reserve their right, upon discovery, to include additional parties as counterclaim defendants in this action.

## PRELIMINARY STATEMENT

145.    Defendant Mehulol Publications LLC, d/b/a AMI Magazine, which is published weekly in New York and Jerusalem and distributed worldwide, is a very well-known and reputed magazine in the international Jewish community. AMI Magazine is the owner of four New York state trademark registrations for the name BizTank.[1] In early 2016, defendants hired plaintiff Joel Klein, a relatively unknown writer in the New York Jewish community, and his company IMBC to power their initiative by organizing shark-tank like events. This initiative went on to become the highly popular, BizTank. Plaintiff Joel Klein's duties included contacting investors who were selected by defendants, hiring a videographer, participating in the selection of the pitches, providing space for the events and lunch for the participants, and generally hosting the events.

146.    In exchange for providing these logistical services, plaintiff Joel Klein repeatedly requested and was given the highly sought-after opportunity to contribute a column in AMI Magazine's business section, essentially to gain publicity and raise his profile. In addition, the parties agreed, verbally, as is the standard practice in their Jewish community, that the entrepreneurs who secured investment through these events will pay a commission and the commission would be split equally. The commission was the compensation for organizing the relevant activities in connection to the initiative and publicizing the entrepreneur's products through the AMI Magazine ("AMI"). But until any meaningful commission was generated, AMI covered the expenses by paying vendors directly. The parties also agreed that when the BizTank events generated meaningful income, they will split the proceeds in equal shares.

147.    While defendants were diligently spending their funds, labor, skill, goodwill and reputation in developing the BizTank brand and ensuring that their initiative would be a success,

---

[1] Registration Nos. R33063, S24091, S24092, S24093 issued in July 2017 in classes 16, 35, 36 and 41. (*See* Docket No.8-4-8).

plaintiffs were devising a scheme behind defendants' backs to defraud them and steal their mark. Plaintiffs' scheme was well-thought out – use defendants' connections to find an investor, register a rival company using the same name, "Biztank Inc.", hire a PR agency to disseminate false information and create consumer confusion with respect to the brand, sign agreements with potential investors and entrepreneurs secretly and finally, when everything else was set up, file a trademark application for the same name with the USPTO – all geared towards driving AMI out of the market AMI itself had created.

## STATEMENT OF FACTS

148. Founded in 2011, AMI Magazine ("AMI") is a leading publication in the international Jewish Community offering its readers "investigative and intriguing features as well as inviting and professional columns."[2]

149. AMI Magazine series of products are available by subscription, they are on sale in stores and newsstands and can also be found via web browser at www.amimagazine.org.

150. AMI Magazine is a household name in the international Orthodox Jewish Community with acquired respect and recognition as a source of interesting, relevant and quality community news, politics and business.

151. The business section to the magazine, AMI Business, formally launched in 2012 offering a variety of high quality news articles and other community services focused on business development, entrepreneurship, management and financing.

---

[2] www.amimagazine.org/ami-package/

152.    AMI magazine has earned significant revenues from subscription sales and advertising.   By virtue of the success and revenues generated under the AMI service mark, AMI has established strong secondary meaning for its umbrella mark "AMI."

153.    Throughout the years, AMI has conceived many different business vehicles and columns for AmiBusiness, each of them under different service marks including, "Ami's Lunch Break", "Ami's Accelerator", "Ami's LaunchPad" to name a few.   Ami LaunchPad and Ami Accelerator columns, **Docket No. 8-4-3.**

154.    The business columns, "Ami's Accelerator" and "Ami's Launchpad" both followed the style of the famous TV show, Shark Tank (hereinafter the "Ami's shark tank style" columns).

155.    Although the name of each new column changes, it is customary for AMI Magazine to maintain the prefix "AMI" as a common denominator allowing the public to clearly identify the source of the services being offered through the magazine's weekly content.[3]

156.    The content published in and for AMI Business is written by various contributors as independent contractors of AMI.  Once the articles are written, they are submitted to AMI's editors for review and approval.

157.    Defendant Joel Klein, started working and writing for AMI in 2015.

158.    In February 2016, in an effort to bring back the Shark Tank Style columns, AMI created the name "AMI's BizTank" for a new column for AMI Business.

159.    AMI appointed Klein to write articles for Ami's BizTank, and hired his company IMBC, to market and promote the BizTank column.

---

[3] The evidence on this case docket shows that Ami has a long-standing practice of inserting its widely recognized service mark "AMI" as a prefix in their published columns as a seal of consumer trust and recognition in order to ensure to its readership that the content has the quality control of the AMI brand. Ami LaunchPad and Ami Accelerator columns, Docket No.8-4-3.

160.    Klein and his team at IMBC wrote, marketed and promoted AMI's BizTank with the knowledge, consent, direction and funding of AMI Magazine and in exchange for the goodwill associated with the AMI brand. Aff. Mrs., Frankfuter, **Docket No. 8-4, ¶ 6.**

161.    On or about May 2017, defendant Joel Klein, was directed by AMI to ceased to write for AMI.  The relationship between Klein and AMI had deteriorated for several weeks after AMI had confronted Joel Klein and his wife Leah regarding an article published in the New York Daily News pursuant to which Joel Klein suggested that AMI was merely a publication outlet for AMI's BizTank.

162.    Plaintiffs further engaged the services of a marketing agency headed by Ronn Torossian and made false statements to the public by claiming inter alia, that Joel Klein is the creator of BizTank.

163.    Since, at least, April 2017 up to this date, defendants have continued to infringe defendants' mark by continuing to publish articles and upon information and belief, enter into agreements with third parties whom they met while contributing to AMI on AMI's BizTank.

164.    Plaintiff Joel Klein's unauthorized use of the AMI's BizTank mark in connection with his business and services, without permission and or authorization from AMI, has caused and if not stopped will continue to cause confusion and deceive consumers as to the source of counterclaim-plaintiffs' goods and services.

### AMI Business Columns

165.    On or about 2012 AMI selected Maurice Stein, a well-regarded Jewish Orthodox business coach and writer as a contributor to write new content for AMI Business.

166.     From 2012 to 2015 Maurice Stein wrote many columns for AMI Business including Ami's shark tank style columns - Ami's Accelerator and Ami's Launchpad. Ami LaunchPad and Ami Accelerator columns, **Docket No. 8-4-3.**

167.     The AMI's shark-tank style columns created a platform that enabled entrepreneurs in the Jewish Orthodox community to raise seed capital for their businesses by submitting their pitches to AMI Magazine via Ami's email address parnoosa@amimagazine.com and present their reasons as to why they should receive investments from third parties.   In Ami's Launchpad column written by Maurice Stein and published in March 2014 it is stated "we have been accepting applications for our new project the Ami Launchpad – which seeks to help small businesses in our community get off the ground with an investment up to $300,000, and some one on one business coaching with yours truly."  Ami LaunchPad and Ami Accelerator columns, **Docket No. 8-4-3, p. 6.**

## **Plaintiffs Solicit AMI**

168.     On August 19, 2014 Mrs. Frankfurter, Senior Editor of AMI Magazine, received an unsolicited email from Leah Klein (Mrs. Klein) in which Mrs. Klein praised Mrs. Frankfurter by calling her "inspirational" and "motivating."    In the same correspondence, Mrs. Klein requests an opportunity to help develop AMI Business by having her in charge of a shark- style column insisting that it *"can serve as a great column for the [sic] Ami as well as open a new, solid revenue pipeline for the magazine."* **Exhibit 1.**

169.     During the fall of 2014, Ms. Klein persistently continued to solicit AMI by periodically corresponding with Mrs. Frankfurter and praising her and Mr. Frankfurter as "accomplished" and "insightful individuals." **Exhibit 2.**

170.     Knowing the importance of the AMI brand in the international Jewish Community, Ms. Klein continuously wrote emails to Mrs. Frankfurter in an attempt to convince her to accept her husband, Joel Klein as an AMI contributor.

171.     In November 2014, Mrs. Klein wrote to AMI's Senior Editor: "Thanks for your response Rechy. I still feel there is a lot Joel can offer to your readership.  Do I still have a chance to pitch you another version of the column?" **Exhibit 3.**

### Joel Klein becomes a contributing Writer at AMI Magazine

172.     In March 2015, as a result of his wife Leah Klein's persistence, Joel Klein started writing for AMI as a contributor.

173.     From March 2015 until at least April 2017, counterclaim-defendants consulted with and sought the written approval of AMI Magazine at all times for their work in connection with AMI's columns, including AMI's BizTank.   Aff. Mrs., Frankfuter, **Docket No. 8-4, ¶ 15;** Emails regarding Ami's Biztank, **Docket No. 8-4-1** and Ami Involvement in launching columns, **Docket No. 8-4-3.**

174.     Counterclaim-defendants made sure to keep AMI's team informed on a regular basis since AMI's direction, approvals and funds were necessary to run the AMI's BizTank column.[4]

175.     On February 20, 2016, Ms. Klein wrote an email to Mrs. Frankfurter to gather more information about Maurice Stein's Shark-Tank Style columns and expressed her interest in using the same concept for the new column, which later became AMI's BizTank.  **Docket No. 8-4-2.**

---

[4] AMI Magazine does not generally pay their contributors money in exchange for content.  Most contributing writers agree to provide content to the Magazine in exchange for the good will associated with the AMI brand.

176.    In February 2016, AMI commissioned Joel Klein, Leah Klein and their company IBMC, Inc., to take over Maurice Stein's prior shark-tank style project and consequently assist AMI in reviewing the entrepreneurs' submissions, contacting potential investors and overall organizing and coordinating events. Aff. Mrs. Frankfuter, **Docket No. 8-4, ¶ 12-22.**

### The "Ami's BizTank" Service Mark

177.    Prior to launching a new series of business columns, it is customary for AMI to come up with a new name for the series and "AMI's "Biztank" was no different.

178.    The service mark AMI's BizTank was conceived in house at AMI primarily as a "spin-off" of the Shark-Tank Style serials that Maurice Stein had written from 2012 until 2015.

179.    It was Zack Blumenfeld ("Zack"), an employee of AMI, who originally conceived the name "AMI's BizTank[5]."   **Exhibit 4.**

180.    AMI not only conceived the name "AMI's BizTank" but AMI's Editor in Chief, Mr. Frankfurter, also suggested the name "moguls" for the investors[6].   Email exchange, dated April 12, 2016, **Docket No. 8-4-1, p 3.** Thereafter, Zack and Mrs. Frankfurter conceptualized the logo and the overall appearance of the marketing materials for "BizTank."   Screen shots of Zack Blumenfeld[7]'s text messages with Ami's designer **Docket No. 8-4-1, pp. 9-12.**

181.    In addition, a domain name biztankmoguls.com was acquired to be used as a homepage for Ami's BizTank. Counterclaim defendants have thereby profited in bad faith from AMI's BizTank mark and as well as AMI's "moguls" designation for the investors. **Exhibit 5.**

### AMI Controls the quality of the "AMI's BizTank" Service Mark

---

[5] Joel Klein suggested calling AMI's column "GoldTank." **Exhibit 4.**
[6] This is another instance in which Ami's editors rejects a Joel Klein proposal to call the investors "mavens" in an effort to control the quality of the services and the reputation of their prestigious publication (Mrs. Frankfurter calls references to "Mavens" as un-classy).
[7] Zack Blumenfeld has been office manager for Ami Magazine's since 2010.

182.    Moreover, Mrs. Frankfurter and her team at AMI Magazine, took the lead in finding investors and selecting the most viable pitches from the potential entrepreneurs.  AMI directed and guided Joel and Leah Klein in every possible way and they sought the approval of AMI's team every step of the way.  Without a doubt, AMI was in charge of the quality control of the mark. Ami's involvement in launching BizTank**, Docket No. 8-4-4**.

183.    On or about May 2017, Leah Klein, requested Zack from AMI Magazine to provide her with the password for AMI's business column email parnoosa@amimagazine.org, [the "Parnoosa Email"] named after the first AMI business column.   Parnoosa text, **Docket No. 8-4-5.**

184.    AMI has used the Parnoosa Email address since Ami Business launched in 2012 with Maurice Stein, primarily to allow entrepreneurs to submit their pitches to AMI for consideration.     Ami LaunchPad and Ami Accelerator columns, **Docket No. 8-4-3, p. 10.**

185.    All investors and presenters (entrepreneurs) participated in AMI's BizTank because of the outstanding reputation associated with the AMI mark/brand.

186.    AMI paid third party service providers for the launch and development of the AMI's BizTank column and service mark including, without limitation, videographers, designers, photographers and transcribers. Invoices, **Docket No. 8-4-6.**

187.    AMI hires employees and engages various contributors as independent contractors to assist the Magazine in creating new content and handling certain projects that are time consuming and require special attention.  Joel and Leah Klein, individually and through their company, IBMC, Inc., were entrusted with the duty to manage the AMI's BizTank column for the benefit of AMI Magazine and in exchange for the goodwill associated with the AMI

brands as well as an equal share of the investment funds secured by third party presenters through the AMI's BizTank platform. Aff. Ms, Frankfuter, **Docket No. 8-4, ¶ 12-22.**

188.    AMI's BizTank was under the guidance, financial auspices and approvals of AMI's team until AMI decided to sever its relationship with Klein due to the misinformation he was feeding to members of the media about Ami's BizTank, and upon information and belief, misappropriate the name "AMI's BizTank."

189.    As AMI's BizTank grew in popularity so did the number of entrepreneurs interested in pitching their businesses to investors or "moguls."

190.    On or about February 2016, the parties verbally agreed that counterclaim-plaintiffs and counterclaim defendants would each receive 1.5% of the investment funds secured by third party presenters through the AMI's BizTank platform ("Verbal Agreement"). In exchange for this percentage, counterclaim defendants agreed to cover a portion of the AMI's BizTank expenses and account to AMI regarding the sums collected pursuant to the Verbal Agreement.

191.    After plaintiffs realized the lucrative opportunity that AMI's BizTank represented, plaintiff Joel Klein, without the knowledge and consent of AMI's principals, filed trademark application Serial No. 87419303 before the United States Patent and Trademark Office with the intent to misappropriate the "AMI's BizTank" mark.[8]    **Exhibit 6.**

192.    At the time plaintiffs filed their application, Serial No. 87419303, the application form indicated that the applied for mark was first used in commerce in April 2017.  However, on July 14, 2017 plaintiffs amended their application and claimed they had used the mark in commerce a year earlier, April 2016.

---

[8] In trademark application Serial No. 87419303 counterclaim-defendants use a specimen of use belonging to AMI in which the mark is used in commerce as "AMI's BizTank" featured on Ami Magazine Issue 265 dated April 20, 2016. Exhibit 6.

193.     In fact, AMI Magazine conceived the trademark BizTank, used the mark in commerce as early as April 2016 and owns four New York state trademark registrations and two pending applications before the United States Patent and Trademark office.  New York Trademark Registration Certificates, **Docket No. 8-4-8**.

194.     Since inception, the services offered through the AMI's BizTank mark were under the direction, control and financial auspices of AMI Magazine until plaintiffs realized that AMI's BizTank was a lucrative opportunity and decided to misappropriate the BizTank mark and use it to their own benefit.

### Fraudulent Concealment of BizTank, Inc and Finder Fee Agreements

195.     On July 12, 2016, Joel Klein and Leah Klein registered BizTank, Inc., a New York corporation, without the knowledge and consent of AMI and concealed the existence of the company from AMI Magazine.   Certificate of Incorporation, **Docket No. 3-2-A, p.2**.

196.     Despite creating BizTank, Inc. in 2016, plaintiffs failed to use the company name in connection with any goods or services associated with the BizTank mark until April 2017.  In fact all agreements and articles that counterclaim-defendants provided are dated post April 2017.

197.     Counterclaim-defendants executed finder fee agreements with third parties without the knowledge and consent of AMI and concealed these unauthorized agreements from AMI.  As a matter of fact, AMI learned about the existence of the BizTank, Inc., and the alleged finder fee agreements when counterclaim-defendants started this action.

### Joel Klein Engages 5WPR Marketing Agency

198.     Upon information and belief, in April 2017, plaintiffs engaged the services of 5WPR Marketing Agency ("5WPR"), headed by Ronn Torrosian, without counterclaim-plaintiffs' knowledge or consent, and a result, a series of articles were published making false

representations regarding BizTank's creation, ownership and control.  Affirmation of Joel Klein, **Docket No. 3-2, ¶¶ 39-44, 51.**

199.    Plaintiffs knew that the statements were false but nonetheless directed 5WPR to caused these articles to be published in main stream as well as Jewish Orthodox media.

200.    On or about April 2017 a media article about BizTank published in the New York Daily news caught the attention of AMI Magazine's principals.  The article discussed how BizTank had become the Jewish Orthodox Shark Tank and implied that AMI was just the medium for publishing and advertising BizTank.   The article immediately prompted Mr. and Mrs. Frankfurter to request a meeting with Joel and Leah Klein. Aff. Mrs. Frankfuter, **Docket No. 8-4, ¶ 24-25.**

**The Collaboration Ends**

201.    AMI met with counterclaim-defendants in late May 2017 and requested that the counterclaim-defendants recant their false statements to the media and that the parties memorialize the Verbal Agreement detailing the financial arrangement between them in connection to the finder fees. Aff. Mrs. Frankfuter, **Docket No. 8-4, ¶ 26.**

202.    Counterclaim-defendants requested that AMI increase the 1.5% previously agreed upon by the parties and, at the request of Mr. Frankfurter, agreed to submit a written proposal for AMI's review and consideration.  *Id.*

203.    Instead of sending a new proposal to AMI, counterclaim-defendants severed their relationship with AMI Magazine and resolved to misappropriate the mark by providing false information to the public, including stating that Klein was the creator of the BizTank mark.

204.    On June 2, 2017, AMI received a cease and desist letter from counterclaim-defendants' counsel in connection with AMI's purported unauthorized use of BizTank.   Aff. Mrs. Frankfuter, **Docket No. 8-4, ¶ 27-28.**

205.    On the same day, Mr. Frankfurter responded to the cease and desist letter stating that plaintiffs do not have the right to use the BizTank mark and suggested resolving the dispute before Rabbinical Court.  **Exhibit 7.**  Counterclaim-defendants failed to appear in rabbinical court which left counterclaim-plaintiffs no other option but to request an ex parte injunction to the rabbinical court to preserve their rights.

206.    AMI obtained a preliminary injunction returnable on June 12, 2017 before the Rabbinical Court of Din Torah of Boro Park.  **Exhibit 8.**

207.    Counterclaim-defendants never complied with the Rabbinical Court injunction and instead, filed an action against AMI and Mr. and Mrs. Frankfurter in New York State Court, Kings County.

208.    Counterclaim-defendants sent a cease and desist letter to counterclaim-plaintiffs on June 2, 2017.

209.    Thereafter, counsel for counterclaim-plaintiffs offered to grant counterclaim-defendants a license to use a similar mark namely, B-Tank[9], but counterclaim-defendants refused arguing their purported ownership of the mark.

210.    Upon information and belief, counterclaim-defendants' unauthorized use of AMI's BizTank mark started as early as April 2017 by executing, without counterclaim-plaintiffs' knowledge and consent, finder fee agreements between BizTank, Inc., and some of the presenters (entrepreneurs).

---

[9] Upon information and belief counterclaim-defendants are using a B-tank trademark and filed an application for the B-tank mark registration before the USPTO on July 21, 2017.

211. Counterclaim-defendants misappropriated the biztankmoguls.com domain to promote their new B-Tank mark along with the BizTank that they stole from Ami. Currently, counterclaim-plaintiffs are denied access to the website, even though the content that they have created is still appearing on it. **Exhibit 9.**

212. In addition to counterclaim defendants' unauthorized use of the mark BizTank, on or about June 2017, counterclaim- defendant Joel Klein contacted Ross & Co., and falsely stated, inter alia, that AMI did not have the right to use the BizTank mark and made specific threads to Ross & Co., claiming that he would tarnish their reputation if Ross & Co., decided to work with AMI Magazine on BizTank. Aff. Mrs. Frankfurter Docket 8-4 ¶ 30.

213. Counterclaim- defendants' false designation of origin in connection to AMI's BizTank mark began on or about May 2017.

214. To date, counterclaim-defendants continue to use AMI's BizTank mark in commerce, by hosting round tables under the BizTank name, subscribing agreements, causing third parties to create content and distributing infringing content. Counterclaim-defendants' actions have created and continues to create consumer confusion as to the source of the goods and services protected by the AMI's BizTank mark.

## FIRST COUNTERCLAIM

### False Advertising and Unfair competition pursuant to 15 U.S.C. 1125 (a)

215. Counterclaim-plaintiffs repeat, reiterate and reallege each and every allegation as stated above, as if more fully set forth herein a length.

216. Counterclaim-defendants are offering competitive goods and services that are deceivingly similar to the goods and services that AMI Magazine offers to its customers.

217.    Counterclaim defendants have used Ami Magazine's trademark and information obtained while working for Ami Magazine to solicit Ami Magazine's customers and provide competing goods and services.

218.    The misappropriation and use of Ami Magazine's information and resources (including valuable contacts) as well as the AMI's BizTank mark have made it possible for counterclaim defendants to hurt Ami and gain an unfair competitive advantage.

219.    By reason of the foregoing, counterclaim defendants have engaged in unfair competitive practices against Ami Magazine in violation of the Lanham Trademark Act 15 USC 1125 (a) that have resulted in the loss and threatened loss of Ami Magazine's consumer confidence and reputation.

220.    Counterclaim plaintiffs have no adequate remedy at law, and will be irreparably harmed unless counterclaim defendants are enjoined from engaging in unfair competitive practices.

221.    The unauthorized acts of misappropriation constitute unfair competition and has caused counterclaim plaintiffs damages in an amount to be determined at trial and non-compensable injury to counterclaim plaintiffs' goodwill and reputation requiring injunctive relief.

## SECOND COUNTERCLAIM
### Common Law Trademark Infringement and False Designation of Origin
### 15 U.S.C. § 1125 (a)

222.    Counterclaim plaintiffs repeat, reiterate and reallege each and every allegation stated above, as if more fully set forth herein at length.

223.    Counterclaim defendants' aforesaid conduct infringes, contributorily infringes or induces the infringement of AMI Magazine's rights over the BizTank trademark.

224.    Counterclaim defendants have actively engaged and continue to engage in the unauthorized use of AMI's BizTank trademark, including, without limitation, spreading and causing others to spread false statements relating to the creation and ownership of the trademark, engaging in acts to deceive consumers as to the source of the services provided by counterclaim plaintiffs' mark and in violation of Section 43 (c) of the Lanham Act 15 U.S.C. § 1125.

225.    Counterclaim defendants' unauthorized use of AMI's BizTank trademark has caused and will continue to cause, irreparable injury in an amount to be determine at trial.

### THIRD COUNTERCLAIM
### (Common Law Unfair Competition)

226.     Counterclaim plaintiffs repeat, reiterate and reallege each and every allegation stated above, as if more fully set forth herein at length.

227.    Counterclaim defendants have engaged, and are continuing to engage, in acts of unfair competition in violation of common law.

228.    Counterclaim plaintiffs have been injured and continue to suffer irreparable injury for which there is no adequate remedy at law as a result of counterclaim defendants' unlawful and inequitable conduct.

229.    Such conduct on the part of the counterclaim defendants has caused and will continue to cause damages to counterclaim plaintiffs in an amount to be determined at trial and non- compensable injury to counterclaim plaintiffs' goodwill and reputation.

### FOURTH COUNTERCLAIM
### Dilution in Violation of New York General Business Law
### (N.Y. GEN. BUS. LAW § 360-1)

230.     Counterclaim plaintiffs repeat, reiterate and reallege each and every allegation stated above, as if more fully set forth herein at length.

231.     Counterclaim-defendants' conduct injures AMI Magazine's business reputation and dilutes the distinctive quality of the AMI's BizTank mark.

232.     Counterclaim defendants' conduct violates section 368-d of the General Business Law of the State of New York.

233.     Counterclaim-plaintiffs have no adequate remedy at law and AMI Magazine will be irreparably harmed unless Plaintiffs are enjoined from diluting the reputation and distinctive quality of Biztank.

234.     By reason of the foregoing counterclaim plaintiffs have been damaged in an amount to be determined at trial.

### FIFTH COUNTERCLAIM
**(Common Law Fraud/ Fraudulent Concealment)**

235.     Counterclaim plaintiffs repeat, reiterate and reallege each and every allegation stated above, as if more fully set forth herein at length.

236.     Counterclaim defendants have deployed a scheme to steal BizTank by secretly registering a company with the same name behind counterclaim-plaintiffs' back, signing agreements with third parties without informing counterclaim-plaintiffs, while continuing to seemingly act under "the joint undertaking" with AMI and using AMI's reputation and connections.

237.     As a result of counterclaim defendants' unauthorized actions and material concealment of important facts, counterclaim-plaintiffs have been damaged in an amount to be determined at trial.

## SIXTH COUNTERCLAIM
### (Breach of Contract)

238.     Counterclaim plaintiffs repeat, reiterate and reallege each and every allegation stated above, as if more fully set forth herein at length.

239.     The Verbal Agreement constitutes a valid and legally enforceable contract.

240.     Counterclaim plaintiffs have performed all of their obligations pursuant to the Agreement between the parties.

241.     Plaintiffs have breached and violated the Verbal Agreement by commencing a competing business using counterclaim plaintiffs' mark, network, reputation, efforts, labor and investments.

242.     By reason of the foregoing breaches of contract, Defendants have been damaged in an amount to be determined at trial, but in an amount that is no less than 50% of the gross receipts collected by counterclaim-defendants pursuant to the finder fee agreements.

## SEVENTH COUNTERCLAIM
### (Breach of Implied Covenant of Good Faith, Fair Dealing, and Fiduciary Duty)

243.     Counterclaim plaintiffs repeat, reiterate and reallege each and every allegation stated above, as if more fully set forth herein at length.

244.     A covenant of good faith and fair dealing is implied in all contracts including the Verbal Agreement and counterclaim-defendants owed a fiduciary duty to counterclaim-plaintiffs.

245.     In failing to disclose pertinent information, including their intent to register a company and commence a competing business using counterclaim-plaintiffs' BizTank

trademark, counterclaim-defendants have breached the implied covenant of good faith and fair dealing and have willfully deprived counterclaim-plaintiffs of the benefits of their bargain.

246.    By reason of the foregoing breaches of the covenant of good faith and fair dealing, counterclaim-plaintiffs have been damaged in an amount to be determined at trial.

## **EIGHT COUNTERCLAIM**
### **(Tortious Interference)**

247.    Counterclaim plaintiffs repeat, reiterate and reallege each and every allegation stated above, as if more fully set forth herein at length.

248.    As set forth above, counterclaim defendants' actions in misappropriating counterclaim plaintiffs' property right in the AMI's BizTank mark in starting a competitive business under the same exact name as well as counterclaim defendants' material misrepresentations to third parties, including that they are the sole owners and creators of BizTank  including, without limitation, preventing counterclaim plaintiffs from using videos that are that were conceived for counterclaim plaintiffs' own benefit constitute unjustifiable interference and encroachment on the commercial prospective advantage.

249.    These acts of misappropriation have caused counterclaim plaintiffs monetary damages in amount to be determined at trial, as well as injury to their reputation and goodwill, fame and recognition.  Counterclaim plaintiffs have no remedy at law and thus are damaged in an amount yet to be determined.

## **NINTH COUNTERCLAIM**
### **(Cybersquatting pursuant to 15 U.S.C. 1125(d))**

250.    Counterclaim plaintiffs repeat, reiterate and reallege each and every allegation stated above, as if more fully set forth herein at length

251.    Counterclaim defendants are using the domain name biztankmoguls.com to conduct their business without the consent and authorization of counterclaim plaintiffs. The domain name biztankmoguls.com was acquired to be used as a homepage for Ami's BizTank. Counterclaim defendants have thereby profited in bad faith from AMI's BizTank mark and as well as AMI's "moguls" designation for the investors. This domain name is confusingly similar to AMI's mark and creates confusion to the public as to the source of the services that the mark protects. Counterclaim-defendants are using this website to promote their new B-Tank mark along with the BizTank that they misappropriated from Ami. Currently, counterclaim-plaintiffs are denied access to the website, even though the content that they have created is still appearing on it.

252.    By reasons of the foregoing counterclaim plaintiffs have been damaged in an amount to be determined at trial.

**TENTH COUNTERCLAIM**
**(Conversion)**

253.    Counterclaim plaintiffs repeat, reiterate and reallege each and every allegation stated above, as if more fully set forth herein at length

254.    Counterclaim defendants obtained the domain name biztankmoguls.com with AMI's consent, approval and for the benefit of AMI's BizTank column.   Counterclaim defendants have misappropriated the domain to conduct their own competing business. Counterclaim defendants have thereby profited in bad faith from counterclaim plaintiffs' mark and their reputation and connections, including without limitation, the investors (or moguls).

255.    By reasons of the foregoing counterclaim plaintiffs have been damaged in an amount to be determined at trial.

## ELEVENTH COUNTERCLAIM
### (Unjust Enrichment)

256.    Counterclaim plaintiffs repeat, reiterate and reallege each and every allegation stated above, as if more fully set forth herein at length.

257.    Counterclaim defendants were enriched at the expense of counterclaim plaintiffs. Equity and good conscience require that counterclaim-plaintiffs recover the enrichment from the counterclaim-defendants.

258.    Counterclaim plaintiffs have been damaged in an amount to be determined at trial.

## TWELFTH COUNTERCLAIM
### (Declaratory Judgment)

259.    Counterclaim plaintiffs repeat, reiterate and reallege each and every allegation stated above, as if more fully set forth herein at length.

260.    As set forth above, a dispute and justiciable controversy exists between Plaintiffs and Defendants regarding the ownership of the trademark "BizTank."

261.    By reason of the foregoing, Defendants seek a declaratory judgment that Mehulol Publications d/b/a AMI Magazine is the rightful owner of the trademark "BizTank."

## THIRTEENTH COUNTERCLAIM
### (Slander)

262.    Counterclaim plaintiffs repeat, reiterate and reallege each and every allegation stated above, as if more fully set forth herein at length.

263.    That after the fallout of the relationship between the parties, counterclaim defendant Joel Klein called Roth & Co., an accounting firm that AMI had selected to become

their new collaborator in the BizTank initiative and threatened to ruin their reputation if they agreed to work with AMI on BizTank.

264.    As a result of Mr. Klein's slanderous comments, Roth & Co., proposed to put the collaboration with AMI on hold.

265.    Counterclaim- defendant spoken statements were false at the time they were made, the counterclaim-defendant knew of their falsity and the statements were spoken willfully and maliciously with the intent to damage AMI's good name, business and reputation.


## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, it is respectfully requested that this Court grant counterclaim-plaintiffs judgment as follows:

(i)    On the First Counterclaim for False Advertising and Unfair competition pursuant to 15 U.S.C. 1125(a), awarding a counterclaim-plaintiffs damages in an amount to determined at trial;

(ii)    On the Second Counterclaim for trademark infringement, awarding counterclaim-plaintiffs damages in an amount to determined at trial;

(iii)    On the Third Counterclaim for Common Law Unfair Competition, awarding counterclaim plaintiffs damages in the amount to be determined at trial.

(iv)    On the Fourth Counterclaim for Dilution, awarding counterclaim plaintiffs damages in the amount to be determined at trial;

(v)    On the Fifth Counterclaim for Fraud/ Fraudulent Concealment, awarding counterclaim plaintiffs  damages in the amount to be determined at trial;

(vi)    On the Sixth Counterclaim for Breach of Contract, awarding counterclaim-plaintiffs damages in the amount to be determined at trial, but not less than 50% of the total amount of gross revenue arising from the finder fee agreements;

(vii)    On the Seventh Counterclaim for Breach of Implied Covenant of Good Faith and Fair Dealing, and Fiduciary Duty awarding counterclaim-plaintiffs damages in the amount to be determined at trial;

(viii)    On the Eight Counterclaim for Tortious Interference, awarding counterclaim plaintiffs-damages in an amount to be determined at trial;

(ix)    On the Ninth Counterclaim for Cybersquatting pursuant to 15 U.S.C. 1125(d), awarding a counterclaim-plaintiffs damages in the amount to be determined at trial;

(x)    On the Tenth Counterclaim for Conversion, awarding counterclaim-plaintiffs damages in an amount to be determined at trial;

(xi)    On the Eleventh Counterclaim Unjust Enrichment, awarding counterclaim-plaintiffs damages in the amount to be determined at trial;

(xii)    On the Twelfth Counterclaim for Declaratory Judgment, awarding counterclaim-plaintiffs damages in the amount to be determined at trial;

(xiii)    On the Thirteenth Counterclaim for Slander, awarding counterclaim-plaintiffs damages in the amount to be determined at trial

(xiv)    Enjoining counterclaim-defendants from using the BizTank mark;

(xv)    Awarding enhanced damages for the willful infringement of the BizTank mark by counterclaim-defendants;

(xvi)    Awarding counterclaim-plaintiffs an accounting in connection to all the income that counterclaim-defendants have collected arising form their unauthorized use of the mark;

(xvii)   Awarding counterclaim-plaintiffs' attorney's fees and costs;

(xviii)  Awarding counterclaim-plaintiffs other and further relief as this Court deems just and

proper.


Dated:  New York, New York
        November 29, 2017                    CITTONE & CHINTA, LLP


                                By:      /Francelina M. Perdomo/
                                         Francelina M. Perdomo (FP-4429)
                                         Padmaja Chinta
                                         Antoaneta Tarpanova
                                         *Attorneys for Defendant*s
                                         One World Trade Center, suite 8500
                                         New York, New York 10007
                                         Tel. (212) 274-1261
                                         E-mail: fperdomo@cittonechinta.com